NEW YORK & NEW JERSEY TRANSP. CO. v. PENNSYLVANIA R. CO.

(Circuit Court of Appeals, Second Circuit. January 9, 1911.)

No. 68.

COLLISION (§ 153*)—VESSEL MOORED AT NIGHT IN FOG—IDENTITY OF MOVING VESSEL.

   Libelant's coal barge, which formed one of a tow of 20 boats moored to one of a number of piers at South Amboy, N. J., at night in a fog was struck and injured by some steam vessel or tow which entered the slip. The piers were owned by respondent and used by it exclusively in its coal business, and none except its own tugs were shown to have been around the piers that night; but there was testimony that two or three of its tugs were there, one of which made up the tow. The master of the barge also testified that the tug which did the injury had respondent's distinguishing mark on her funnel, although he was unable to make out her name in the fog. *Held*, that a finding of the district judge that the injury was done by a vessel of respondent and holding it liable for the damage would not be disturbed by the appellate court.

   [Ed. Note.—For other cases, see Collision, Dec. Dig. § 153.*]

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in admiralty by the New York & New Jersey Transportation Company against the Pennsylvania Railroad Company. Decree for libelant, and respondent appeals. Affirmed.

The action is in personam, the libelant being unable to name the respondent's tug which did the injury.

Robinson, Biddle & Benedict (O. D. Duncan and W. S. Montgomery, of counsel), for appellant.

Wray & Callaghan (Albert A. Wray, of counsel), for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

COXE, Circuit Judge. The libelant's coal barge, the Stickney & Conyngham—hereafter called the Stickney—was, on the night of the 15th of February, 1909, lying at South Amboy, New Jersey, waiting for a heavy fog to lift in order that she might be towed to New York. The Stickney was one of a tow of twenty boats made up in five tiers of four boats each. She was the port boat in the third tier, having been placed there by a tug belonging to the respondent. The tow was made fast to pier B in such a manner that it swung diagonally towards pier A, the next pier to the north. The Stickney's port side was from 30 to 60 feet from the latter pier. While lying in this position a collision occurred about 11 p. m. between her and a tug which struck her on the port side near the bow and caused the injury complained of.

The sole question is one of fact—was this tug owned by the Pennsylvania Railroad Company?

The following propositions may be considered as established:

First.—The Stickney received a blow at about 11 o'clock on the night of February 15th while lying between piers A and B at South Amboy. The blow was sufficiently severe to break one of her fenders and the 12 by 6 yellow pine top-piece on her port bow.

Second.—These piers are the property of the Pennsylvania Railroad Company and are used exclusively by it in conducting its coal business. Occasionally a tug owned by others goes in there to tow out a schooner or similar vessel, but never at 11 o'clock at night. There is no proof that a stranger tug was at or near the piers at any time in controversy.

Third.—At the time of the collision a dense fog existed, but the piers were lighted by electricity, there being an electric light about 100 feet from the end of pier A.

Fourth.—All of the tugs of the respondent have the keystone painted on their funnels, which is their distinguishing mark.

Fifth.—The blow must have been struck by a tug or by a boat in control of a tug.

Starting with these established propositions, it must be conceded that a strong presumption exists that one of the respondent's tugs caused the damage complained of. There is a total failure to prove any other cause. If the respondent's tugs be eliminated, the collision must be regarded as miraculous.

We are not, however, left to presumption. There is direct proof that a Pennsylvania tug struck the blow. Undoubtedly there are inconsistencies and contradictions in the testimony of the master of the Stickney, but this is not astonishing, in view of the darkness and the heavy fog. It is not at all surprising that he should be unable to give the name of the tug. He testifies positively that the tug he saw backing away from his boat had a keystone on her funnel.

If this be true, it matters not what else she had or omitted to have. The master says that when he first felt the shock he opened the door and saw that the tug was just lying "like a shadow with her bow to my side backing out. I couldn't see her name at all, for it was too dark and foggy, but I could see just like a shadow or picture of a boat in a fog. The electric light threw a light on the top of the funnel. Down below I could see the keystone mark, half the funnel down, and I could see the top of the wheel house." It is conceded that respondent's tug No. 33 was at the piers that night, she being the tug that brought the Stickney there and located her in the tow. The tug's master says that this was done between nine and ten o'clock in the evening, that about eleven it got foggy and that he kept control of the tug until about 1:40 a. m. He says:

"I was picking up a load of boats, shifting boats around the slips that night in the immediate vicinity of pier B. I was in that general neighborhood during the whole time. The space between the tow and the south of pier A was, I should judge, about fifty feet. I went through that space that night."

It thus appears that one of the respondent's tugs was in the vicinity of the Stickney, moving about and must have passed at one time within a few feet of her if the tug, as she says she did, went through the fifty-foot space, with a coal barge. She may have collided with the Stickney or her tow barge may have done so without her knowledge. It is true that the master of the Stickney says that the tug which struck him had a white band on her funnel and No. 33 has no such band. The master also testifies that No. 33 was not the guilty tug and that at the time he thought it was the Linden or the Morion. We attach very little importance to the statement of the master in saying that No. 33 had a white band around her funnel. Such a mistake might easily occur in describing objects seen on a foggy night and, as the tug was admittedly present, the testimony was wholly inconsequential.

Again, he may have been mistaken in exculpating the No. 33. He says he could not see the name of the tug and did not know which of the tugs it was. How then can he be sure that it was not No. 33?

There is testimony that other Pennsylvania tugs were at the head of pier A and in the immediate vicinity on the night in question, and the circumstance that their connection with the collision is explicitly denied does not eliminate the question of fact presented.

Although there is a sharp conflict upon the testimony, there was sufficient proof to sustain the conclusion of the district judge. There is no doubt as to the injury to the Stickney, which was inflicted by some human agency. Upon the proof no boats except those controlled by the respondent could have inflicted the injury, it is conceded that one tug of the respondent was in the immediate vicinity, moving about during all the time in question and the libelant's testimony points to the presence of two other tugs. In such circumstances, we are not justified in setting aside the decree of the trial judge who heard the testimony of most of the important witnesses.

It is argued that the respondent is liable for having moored the tow in so careless a manner that instead of lying along pier B it drifted

diagonally across the slip until a passage of only about 50 feet remained. Although there is force in this contention it is unnecessary to decide the question.

Decree affirmed with costs.